United States District Court
Southern District of Texas
**ENTERED**
February 15, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHUNEKA E. WHITAKER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-15-2035 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 19) and Defendant's Motion for Summary Judgment (Doc. 20). The court has considered the motions, Defendant's response to Plaintiff's motion, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claims for disability insurance benefits and supplemental security income

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 5, Ord. Dated Nov. 30, 2015.

under Titles II and XVI of the Social Security Act ("the Act").

## A.  **Medical History**

Plaintiff was born on February 18, 1978, and was thirty-two years old on the alleged disability onset date of September 20, 2010.[2] Plaintiff achieved a high school education and training as a medical assistant.[3] Prior to 2007, Plaintiff worked as a medical assistant and security officer.[4] Since 2007, she worked as a cashier, an airport truck driver, a security officer, a telemarketer, and a warehouse laborer.[5] Plaintiff was employed for a period of time after the alleged onset date but stopped working on July 26, 2011, because her symptoms interfered with her ability to maintain her work schedule.[6]

Prior to the alleged disability onset, Plaintiff began experiencing headaches, neck pain, and paresthesia[7] in her arms and legs, especially on the left side of her body.[8]  She was diagnosed

---

[2]     See Tr. of the Admin. Proceedings ("Tr.") 102, 109, 137.

[3]     See Tr. 141-42, 751.

[4]     See Tr. 201.

[5]     See Tr. 130-32, 142; but see Tr. 32 (stating that Plaintiff's past relevant work was security officer, telemarketer, and medical assistant); Tr. 155 (stating that Plaintiff's only past relevant work was security guard and cashier).

[6]     See Tr. 141, 211.

[7]     Paresthesia is "any subjective sensation, experienced as numbness, tingling, or a 'pins and needles' feeling." See Mosby's Pocket Dictionary of Med., Nursing, & Allied Health 664 (1st ed. 1990).

[8]     See Tr. 215.

with Chiari malformation,[9] which was confirmed by a magnetic resonance imaging scan ("MRI").[10]

Plaintiff first saw Jacqueline Carruthers, M.D., ("Dr. Carruthers") on July 11, 2011, for treatment of emotional problems and pain.[11] Plaintiff told Dr. Carruthers that she was looking for a new doctor and second opinions on the cause of swelling on her left side and on her previous doctor's statement that Plaintiff's spinal fluid was not circulating properly.[12] At the time, Plaintiff was employed.[13]

Dr. Carruthers recorded the following self-report by Plaintiff:

> She has been experiencing headaches, changes in vision-blurrines, eyes rotating back and forth, involuntarily. . . . She was seen by the eye doctor yesterday and got a good report. Her L[eft] arm has numbness[,] and left side is larger than the right. She has noticed that she has difficulty swallowing on the Left side of her throat[] but does not choke. She has also noticed her voice is getting deeper. She does have left sided chest pain. Denies dizziness, cough, [nausea/vomiting], abdominal pain. Her left leg has weakness and buckles on her at times, especially when trying to walk for a long distance. She has noticed all of these symptoms developing over the last 2 years. She has been told that treatment will consist of removing her top vertebra

---

[9]     "Chiari malformations are a group of complex brain abnormalities that affect the area in lower posterior skull where the brain and spinal cord connect." Chiari Malformations, WebMD (March 5, 2014), www.webmd.com/migraines-headaches/arnold-chiari-malformation-10486.

[10]     See, e.g., id.

[11]     See Tr. 161.

[12]     See Tr. 217.

[13]     See id.

3

> underneath her skull to release pressure on her brain.
> She will [also have] a mesh support inserted in the place
> of the missing vertebra. P[atient] is very
> ap[p]rehensive about this and just wanted another
> opinion.[14]

In addition to those complaints, Plaintiff reported joint pain, swelling, and muscle weakness but no generalized weakness, no double vision, no tinnitus, no history of incoordination, no difficulty with memory or speech, no limitation of motion, no anxiety, no depression, no insomnia, no tearfulness, no panic attacks, no previous psychiatric care, no suicide attempts, no hallucinations, no memory loss, no tingling in extremities, and no blurred vision.[15]

Upon examination, Dr. Carruthers found Plaintiff to have a normal abdominal aorta with no abnormal sounds or murmurs, to exhibit no edema in the extremities, no focal neurologic deficit, and no involuntary movements, to have normal motor strength, sensory to soft touch, range of motion, and gait.[16]  On the psychiatric front, the doctor found Plaintiff to be oriented to person, place, and time, to exhibit a mood appropriate to interview, a flexible affect, a congruent mood, intact judgment and insight, and appropriate thought processes without suicidal,

---

[14]   Tr. 217.

[15]   Id.

[16]   See Tr. 218.

homicidal, violent, or delusional content.[17] Plaintiff's speech was normal in rate, tone, and volume, and her immediate, intermediate, and long term memory was intact.[18]

Dr. Carruthers listed Chiari malformation as a diagnosis.[19] Dr. Carruthers ordered blood tests, an electromyography ("EMG") procedure, and a laryngoscopy and instructed Plaintiff to return in two weeks.[20]

On August 8, 2011, Plaintiff returned for the results of the blood tests and continued to complain of blurred vision in her left eye, headaches, neck pain and paresthesia.[21] She reported that she experienced no gait instability and that she managed activities of daily living ("ADLs") independently.[22] Her reported symptoms were, in large part the same as reported at her first visit to Dr. Carruthers except that she specifically mentioned neck pain, cramps, and arm and leg paresthesia that was more significant on the left side.[23] Upon examination, Dr. Carruthers noted swelling in Plaintiff's left shoulder but no edema in her extremities.[24] Dr.

---

[17]   See id.

[18]   Id.

[19]   See id.

[20]   See id.

[21]   See Tr. 215.

[22]   See id.

[23]   See id.

[24]   See Tr. 216.

Carruthers observed no involuntary movements.[25]  The examination otherwise yielded similar results to those Dr. Carruthers recorded two weeks prior.[26]

Dr. Carruthers explained the results of the blood work and the clinical symptoms of Chiari malformation, reviewed Plaintiff's prescription medications, and ordered an MRI and an EMG nerve conduction study.[27]  Dr. Carruthers instructed Plaintiff to return in one month for the results of the MRI and EMG.[28]

On September 8, 2011, Plaintiff returned as instructed.[29] Plaintiff complained of depression, anxiety, crying spells, and mood swings, in addition to the physical symptoms of fatigue, headaches, vertigo, arm and leg paresthesia, and neck pain.[30]  She told Dr. Carruthers that she had been working but found it difficult to maintain normal work hours because the exacerbation of her medical symptoms often caused her to call in sick or leave early.[31]  Plaintiff reported that she lived with her mother and independently performed ADLs.[32]

---

[25]   See id.

[26]   See id.

[27]   See id.

[28]   See id.

[29]   See Tr. 211.

[30]   See id.

[31]   See id.

[32]   See id.

Under past medical history, Dr. Carruthers listed Chiari malformation, anxiety, depression, cervical radiculopathy, lumbar radiculopathy, and chronic sinusitis.[33]  A review of symptoms and an examination yielded no notable changes from Plaintiff's prior appointment.[34]  The MRI confirmed the Chiari malformation diagnosis and revealed cervical and lumbar radiculopathy.[35]  Dr. Carruthers diagnosed Plaintiff with depression, anxiety, cervical radiculopathy, lumbar radiculopathy, and paresthesia, in addition to Chiari malformation, and prescribed Cymbalta (generically known as Duloxetine) for depression, Neurontin (generically known as Gabapentin) for pain, and Celebrex (generically known as Celecoxib) for inflamation and pain.[36]  Dr. Carruthers recommended physical therapy, referred Plaintiff to neurosurgery, and "[i]nstructed [Plaintiff] to file for disability temporarily."[37]

On September 12, 2011, Plaintiff saw Edward Duckworth, M.D., ("Dr. Duckworth") on referral from Dr. Carruthers.[38]  Plaintiff reported headaches, neck pain, left arm and left leg pain, numbness of left side of her face, left shoulder, and left arm, tingling of

---

[33]     See id.

[34]     See Tr. 211-12.

[35]     See Tr. 213.

[36]     See Tr. 144, 213.

[37]     Tr. 213.

[38]     See Tr. 263.

7

left arm and left leg, and imbalance when walking.[39] Dr. Duckworth conducted a review of systems and noted, in addition to Plaintiff's self-reported symptoms, occasional shortness of breath and chest pain, tinnitus, double vision, and blurry vision.[40] Dr. Duckworth diagnosed Plaintiff with Chiari malformation and syringomyelia[41] and recommended surgery.[42]

On October 6, 2011, Plaintiff underwent a suboccipital craniectomy and C1 laminectomey with expansion duraplasty for Chiari decompression.[43]  In a discharge summary prepared several days after the surgery, Dr. Duckworth wrote that Plaintiff was "in good clinical condition."[44] He referred her for physical therapy.[45] On October 17, 2011, Sherly V. Sebastian, NP, ("Sebastian") examined Plaintiff and noted that she was "recovering nicely from the surgery."[46]  Plaintiff complained of neck pain, neck spasms, shoulder pain, and fatigue.[47]  Sebastian advised Plaintiff to

---

[39]     See id.

[40]     See Tr. 264.

[41]     "Syringomyelia is a long-term condition that causes fluid-filled cysts . . . to form inside the spinal cord that grows inside the spinal cord" most often caused by a birth defect or an injury.  What is Syringomyelia?, WebMD (Sept. 17, 2016), www.webmd.com/brain/what-is-syringomyelia#1.

[42]     See Tr. 264, 266-67.

[43]     See Tr. 255.

[44]     Tr. 252.

[45]     See id.

[46]     Tr. 251.

[47]     See id.

increase her activities, including physical therapy, as tolerated.[48]

On November 4, 2011, Lacey K. Reulet, DPT, ("Reulet") conducted a physical therapy evaluation.[49] Plaintiff reported that she lived with her mother, who helped Plaintiff bathe, groom, eat, dress.[50] Plaintiff also reported difficulty in driving, walking, standing, using stairs, and sleeping.[51] She reported experiencing pain at a level of eight on a ten-point scale.[52] A manual muscle test revealed full strength in the upper and lower extremities on Plaintiff's right side and diminished strength on the left.[53]

As treatment diagnoses, Reulet listed abnormal posture, abnormality of gait, muscle spasms, and muscle weakness.[54] Reulet identified decreased strength, decreased balance, decreased function, gait deviation, and muscle spasms as problems to be addressed.[55] She opined that Plaintiff's rehabilitation potential was excellent and designed a treatment plan that included three to five physical therapy sessions per week for four weeks and the

---

[48]    See id.

[49]    See Tr. 246, 340.

[50]    See id.

[51]    See Tr. 247.

[52]    See id.

[53]    See id.

[54]    See Tr. 246, 332.

[55]    See Tr. 249.

achievement of eleven specific treatment goals.[56]

Plaintiff received physical therapy on November 8, 9, 10, 14, 15, and 16, 2011. At the first appointment, Plaintiff reported weakness and low endurance in the left arm and leg but tolerated the treatment well.[57] At subsequent appointments, the physical therapist reported that Plaintiff's participation was good and that she was progressing well toward treatment goals.[58] Plaintiff reported soreness at several sessions.[59] On November 14, 2011, Plaintiff reported that she was feeling stronger and rated her pain as minimal.[60] Plaintiff reported that she was trying to increase participation in ADLs with less assistance but that she became dizzy with prolonged standing for cooking or grooming.[61]

On November 21, 2011, Reulet reassessed Plaintiff's condition, noting Plaintiff's report that she was "feeling much better" since starting physical therapy, "she ha[d] more energy and she [felt] like she [was] getting stronger," and she could stand for longer periods.[62] Reulet noted that Plaintiff had shown improvements in strength, gait, and balance but required assistance with prolonged

---

[56]    See id.

[57]    Tr. 343.

[58]    See Tr. 345, 347, 349, 351, 353.

[59]    See, e.g., Tr. 345, 347, 351.

[60]    See Tr. 349.

[61]    See id.

[62]    See Tr. 355, 362–65.

ambulation and rest breaks during exercises.[63]

On November 28, 2011, Sebastian and Dr. Duckworth examined Plaintiff and found that she was "doing well."[64] Sebastian noted that Plaintiff's headaches were "much better" and her fatigue "had improved" but the paresthesia remained in her left arm and left leg and her vision remained blurry.[65] At that point, Plaintiff stopped physical therapy while she waited for insurance approval.[66] Dr. Duckworth recorded that the results of a brain MRI showed "nice decompression, resolution of syrinx in visualized portion of cervical spinal cord."[67]

On December 7, 2011, Plaintiff saw Dr. Carruthers for pain management.[68] Dr. Carruthers noted Plaintiff's diagnoses of Chiari malformation, cervical radiculopathy, and lumbar radiculopathy but omitted all psychiatric diagnoses previously listed.[69] She prescribed Tylenol #3 (generically known as acetaminophen with codeine) for pain and Flexeril (generically known as

---

[63]    See Tr. 365.

[64]    Tr. 244; see also Tr. 45.

[65]    See Tr. 245.  Dr. Duckworth stated that headaches were completely resolved.  See Tr. 244.

[66]    See id.

[67]    Tr. 244.

[68]    See Tr. 279.

[69]    See Tr. 280.

Cyclobenzaprine) for muscle spasms.[70]

On February 1, 2012, Plaintiff returned to Dr. Carruthers, complaining of pain in her left side and a popping noise in her left shoulder upon movement.[71] Dr. Carruthers listed Plaintiff's medication as Neurontin, Cymbalta, Tylenol #3, Flexeril, Sinequan (generically known as Doxepin) for depression and anxiety, and Lexapro (generically known as Escitalopram) for depression.[72]

On February 27, 2012, Sebastian and Dr. Duckworth examined Plaintiff on her complaint of pain.[73] Sebastian noted that Plaintiff stated that she continued to experience numbness, tingling, and pain in the left arm and numbness in the left leg.[74] Plaintiff reported experiencing only mild headaches.[75] Her primary complaint was neck pain in the area of the surgical incision that had begun a week earlier.[76] Flexion and extension x-rays of the cervical spine and an MRI of the brain and cervical spine were ordered, and Dr. Duckworth instructed Plaintiff to use only Neurontin, Tramadol (commonly known as brand name+ Ultram), and

---

[70]   See id.

[71]   See Tr. 281.

[72]   See Tr. 281.

[73]   See Tr. 320.

[74]   See id.

[75]   See id.

[76]   See Tr. 320-21.

Flexeril for pain.[77]

Beginning in March 2012, Plaintiff received treatment for depression at Mental Health Mental Retardation Authority of Harris County ("MHMRA").[78]  At MHMRA, Roberto Flores, M.D., ("Dr. Flores") followed Plaintiff for medication management, and Plaintiff received counseling.[79]  Dr. Flores diagnosed Plaintiff with major depression disorder with psychotic features and consistently noted that Plaintiff reported no suicidal or homicidal ideation and no audio or visual hallucinations and that she was tolerating medications and was improving.[80]  At the start of treatment, Dr. Flores determined Plaintiff's Global Assessment of Functioning ("GAF") to be forty-five out of one hundred, a score at mid range in the category for "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning."[81]  Dr. Flores initially prescribed Cymbalta, Silenor (generically known as Doxepin) for sleep, and Abilify (generically known as Aripiprazole)

---

[77]    See id.

[78]    See Tr. 463-598.  MHMRA is now known as The Harris Center for Mental Health and IDD (Intellectual and Development Disabilities).

[79]    See Tr. 463, 465, 469, 471, 473, 477, 480, 500, 531-33.

[80]    See Tr. 463-65, 467-69, 471-73, 475-77, 488-90, 498.  Dr. Flores also diagnosed Plaintiff with alcohol abuse.  See Tr. 498.

[81]    Tr. 498; Diagnostic & Statistical Manual of Mental Disorders 34 (Am. Psychiatric Ass'n 4th ed. 2000)(replaced in 2013 by the fifth edition, which dropped GAF in favor of the World Health Organization Disability Assessment Schedule 2.0).  Plaintiff's counselor had assessed Plaintiff's GAF to be forty-three (within the same category of functioning) a few days prior to Dr. Flores's assessment of forty-five.  See Tr. 500, 526.

for depression.[82]   Later, Dr. Flores added Desyrel (generically known as Trazodone) for depression.[83]

On April 9, 2012, Plaintiff again saw Dr. Duckworth, who noted, "Neck pain has *resolved!* . . . Still has some extreme numbness, but nonetheless dramatically better overall than before surgery . . . ."[84]

At a physical therapy evaluation on May 29, 2012, Plaintiff reported that, since surgery, her headaches had improved, but she still experienced pain, numbness, and tingling in her left arm from shoulder into her hand and left leg from hip to lower leg.[85]   The physical therapist noted left shoulder elevation with increased hypertrophy of left upper torso, rounded shoulders, and a swollen left arm.[86]   The physical therapist also noted increased tightness, muscle tenderness, and decreased sensation on Plaintiff's left side.[87]

Plaintiff attended physical therapy on June 19, 2012, at which time she experienced left hip pain with exercise.[88]   On June 28,

---

[82]     See Tr. 464, 468, 472, 476.

[83]     See Tr. 532.

[84]     Tr. 322.

[85]     See Tr. 600.

[86]     See Tr. 602.

[87]     See id.

[88]     See Tr. 612-13.

Plaintiff's physical therapy session was deferred due to illness.[89]

On July 23, 2012, Sebastian noted that Plaintiff reported that headaches like those she experienced prior to surgery had returned in June 2012 and her vision was "more blurry."[90]  Plaintiff also stated that she was experiencing neck pain, and tingling, in her neck, left leg and left arm.[91]  An MRI of the cervical spine was ordered, and Plaintiff was told to continue her medications.[92]

On July 30, 2012, Plaintiff was reevaluated for physical therapy, and she reported that the pain remained the same.[93]  Plaintiff did not receive treatment due to expiration of the insurance authorization.[94]  After a total of four visits, Plaintiff was discharged from physical therapy because insurance authorization was not renewed.[95]

On August 7, 2012, Plaintiff followed up with Dr. Carruthers, who noted that Plaintiff complained of "things not getting any better."[96]  Plaintiff reported that she was "very depressed because

---

[89]   See Tr. 620.

[90]   Tr. 324.

[91]   Id.

[92]   See id.

[93]   See Tr. 623.

[94]   See Tr. 624.

[95]   See Tr. 629.

[96]   Tr. 453.

she [could not] work and take care of herself and her daughter."[97] Plaintiff denied suicidal and homicidal ideation.[98] Dr. Carruthers diagnosed Plaintiff with Chiari malformation, depression, anxiety, blurred vision, cervical radiculopathy, paresthesia, and muscle strain and prescribed Zanaflex (generically known as Tizanidine) for muscle spasms, Neurontin, and Cymbalta.[99]

On August 20, 2012, Plaintiff returned to Dr. Duckworth, who noted, "Overall, she has done well and experienced improvement in her symptoms.  She has occasional sharp pains in various parts of her head[] and has some persistent numbness on the left side of the body[] and some mild walking difficulty."[100]  Dr. Duckworth reassured Plaintiff and explained that some symptoms may be permanent.[101]  Dr. Duckworth reviewed the MRI, which showed "nice decompression of foramen magnum, more rounded tonsils, and very small persistent cervical syrinx."[102]

On October 9, 2012, Plaintiff complained to Dr. Carruthers that she continued to experience headaches and cervical neck pain and that the prescribed medication was not alleviating the pain.[103]

---

[97]    Id.

[98]    See id.

[99]    See Tr. 455.

[100]    Tr. 327.

[101]    See id.

[102]    Id.

[103]    See Tr. 457.

Plaintiff described the neck pain as radiating down the left side into the shoulder area at severity level of eight out of ten.[104] Plaintiff told Dr. Carruthers that physical therapy provided a modicum of relief but that Dr. Duckworth offered no additional recommendations for pain relief.[105]   Dr. Carruthers increased Plaintiff's dosage of Zanaflex, re-prescribed Tylenol #3, added a Lidoderm patch, and ordered physical therapy.[106]   The doctor also encouraged Plaintiff "to use a muscle rub with a heating pad daily" and to follow up with Dr. Duckworth.[107]

At that appointment, Dr. Carruthers completed a Medical Release/Physician's Statement in which she opined that Plaintiff had a non-permanent disability that was expected to last more than six months and rendered Plaintiff "unable to work, or participate in activities to prepare for work, at all."[108]   Regarding Plaintiff's ability to perform work-related activities, Dr. Carruthers opined that, per workday, Plaintiff could sit a maximum of eight hours, keyboard a maximum of eight hours, stand a maximum of four hours, walk a maximum of four hours, climb stairs/ladders a maximum of two hours, kneel/squat a maximum of two hours, and

---

[104]    See id.

[105]    See id.

[106]    See Tr. 458.

[107]    See id.

[108]    Tr. 460.

bend/stoop, push/pull, lift/carry less than one hour each.[109]   She also stated that Plaintiff cannot lift/carry more than five pounds for more than two hours per day.[110]   Listing Plaintiff's diagnoses as Chiari malformation and cervical radiculopathy, Dr. Carruthers opined that Plaintiff could "complete community work in an office environment with little physical strain or demand" or work in a classroom setting.[111]

On January 12, 2013, Plaintiff presented to St. Luke's Episcopal Hospital emergency room with left upper extremity swelling and fever and was admitted to the hospital for seventeen days.[112]   Plaintiff also suffered from anemia and tachycardia.[113]   The attending physician consulted specialists in the areas of rheumatology, hematology, and cardiology.[114]   Plaintiff underwent a bone marrow biopsy, a lymph node biopsy, and a video-assisted thoracoscopy.[115]

Twelve days into her hospitalization, an "[e]xtensive infectious disease workup" and "a hypercoagulable workup" both

---

[109]   See id.

[110]   See id.

[111]   Id.

[112]   See Tr. 697-713.

[113]   See Tr. 712.

[114]   See Tr. 707.

[115]   See Tr. 707, 721.

produced negative results.[116]   Plaintiff was treated with anticoagulants, antibiotics, and steroids.[117]   The attending physician diagnosed Plaintiff with acute internal jugular vein thrombosis, a rare vascular disease, and upper extremity cellulitis, a common infection of the skin.[118]  The report of the lymph node biopsy listed mediastinal lymphadenopathy with history of fever and rash as Plaintiff's diagnosis.[119]  According to the discharge summary, Plaintiff was instructed to follow up with Baylor College of Medicine and Hematology Clinic for biopsy results.[120]

On February 17, 2013, St. Luke's Episcopal Hospital again admitted Plaintiff through its emergency room on her report of left-sided weakness, numbness, heaviness, left-sided lateral chest pain radiating to the left side of her neck, and severe headache.[121] Plaintiff described her pain as eight in severity on a ten-point scale.[122]  She was also experiencing tachycardia.[123]

---

[116]   See Tr. 712.

[117]   See Tr. 707.

[118]   Internal Jugular Vein Thrombosis – a Rare Presentation of Mediastinal Lymphoma, ScienceDirect (Sept. 20, 2009), www.sciencedirect.com/science/article/pii/S175500170900089X;  Cellulitis, WebMD (Sept. 2, 2014), www.webmd.com/skin-problems-and-treatments/guide/cellulitis#1.

[119]   See Tr. 721.

[120]   See Tr. 707.

[121]   See Tr. 649, 660.

[122]   See id.

[123]   See Tr. 658.

The medical providers initiated the protocol for pulmonary embolism but found no evidence of a pulmonary embolism or any other new abnormalities.[124]   A cardiologist examined Plaintiff and opined that she was likely experiencing atypical/noncardiac chest pain.[125] Chest radiology confirmed the absence of acute cardiopulmonary disease.[126]   An infectious-disease specialist examined Plaintiff but, despite considering multiple etiologies, did not settle on any diagnosis.[127]

A neurosurgeon was also consulted and observed as Plaintiff was able to get out of bed independently and walk around the room and in the hallway unassisted.[128]   After examination, he noted that the MRI, magnetic resonance angiography, magnetic resonance venogram, computed tomography of the head, and computed tomographic angiogram of the brain all "seem[ed] to have a normal appearance" and that no neurosurgical intervention was warranted.[129]

On discharge, the attending physician listed no new diagnoses but recorded a suspicion for adult-onset Still's disease.[130]

---

[124]    See id.

[125]    See Tr. 663-65.

[126]    See Tr. 655.

[127]    See Tr. 666-68.

[128]    See Tr. 669.

[129]    Tr. 669-70.

[130]    Tr. 658 (listing Chiari malformation, mediastinal lymph node enlargement of unknown origin, and history of deep venous thrombosis including left suclavian and left internal jugular vein).  "Adult-onset Still's disease is

Plaintiff was instructed to return to the clinic within a few days to retest blood-clotting time.[131]

On March 11, 2013, Plaintiff was again admitted to St. Luke's Episcopal Hospital with complaints of suprapubic abdominal pain without nausea, vomiting, diarrhea, fever, or chills.[132]  Plaintiff described the pain as constant and as ten in severity on a ten-point scale.[133]  The medical providers detected a hematoma in the psoas muscle in the lower back, discontinued the anticoagulant medication, and administered pain and nausea medication.[134]  The attending physician noted that the lymph-node biopsy taken during the January hospitalization was negative.[135]

## B.   Application to Social Security Administration

Plaintiff applied for disability insurance benefits and supplemental security income on September 9, 2011, claiming an inability to work since September 20, 2010, due to Chiari malformation.[136]

---

an inflammatory disease that may affect many joints, internal organs, and other parts of the body."  Adult-Onset Still's Disease, WebMD (Sept. 16, 2016), www.webmd.com/arthritis/adult-onset-stills-disease#1.

[131]   See Tr.

[132]   See Tr. 635, 636.

[133]   See id.

[134]   See Tr. 642.

[135]   See id.  The administrative records do not include a discharge summary for this hospitalization.

[136]   See Tr. 102-117, 137, 141; but see Tr. 35, 36, 41, 42 (identifying the Title II application date as September 7, 2011, and the Title XVI application date as September 8, 2011).

In a function report completed in October 2011, Plaintiff stated that she "[could] not work because of poor coordination, blurred vision, [h]eadaches, loss of control in left arm [and] leg, . . . depress[ion] . . . constant neck, arm, shoulder, hip, [and] leg pain on left side, numbness on leg side and left side of face, [and] ringing in ears."[137]   Plaintiff listed watching television and sleeping as her only daily activities.[138]   She said that her grandmother transported Plaintiff's daughter to and from school and prepared dinner.[139]

Plaintiff also reported that she needed help from her daughter with personal hygiene because of the loss of control and numbness in left extremities and that she could eat only with her right (dominant) hand.[140]   Plaintiff's daughter performed all of the housework, Plaintiff stated, and made a list of Plaintiff's dosages and times so that Plaintiff's grandmother, with whom Plaintiff and her daughter lived, could dispense Plaintiff's medication.[141] Plaintiff's only outside activities were doctor appointments once or twice per week, she reported.[142]   Even then, she said, she could

---

[137]   Tr. 147.

[138]   See Tr. 148.

[139]   See id.

[140]   See Tr. 148, 152.

[141]   See Tr. 149, 285.

[142]   See Tr. 150; but see Tr. 151 (stating that she had doctor appointments once or twice a month).

not travel alone because she could not drive and suffered from
headaches, blurred or double vision, numbness, loss of control in
left extremities, and forgetfulness.[143]   Plaintiff reported no
social activities.[144] With regard to social interactions, Plaintiff
blamed depression and anger for problems she experienced in getting
along with others.[145]

On the question asking which abilities were affected by her
condition, Plaintiff checked the boxes for all of the following:
lifting, squatting, bending, standing, reaching, walking, sitting,
kneeling, hearing, stair climbing, seeing, remembering, completing
tasks, concentrating, understanding, following instructions, using
hands, and getting along with others.[146] The only box she did not
check was the one for talking.[147] Plaintiff was unable to answer
questions about how far she could walk before taking a break, how
long she could pay attention, and how well she followed spoken
instructions.[148] Plaintiff indicated that she did not read because
of blurred vision, headaches, and anger.[149] Plaintiff reported that
she did not get along with authority figures, she did not handle

---

[143]    See Tr. 150, 151.

[144]    See Tr. 151.

[145]    See Tr. 152.

[146]    See id.

[147]    See id.

[148]    See id.

[149]    See id.

stress or changes in her routine very well, and that she cried a lot.[150]  She said that she was always feeling angry and was always "fussing."[151]

On November 1, 2011, Caren Phelan, Ph.D., ("Dr. Phelan") reviewed Plaintiff's medical record and completed a Psychiatric Review Technique.[152]  Dr. Phelan opined that Plaintiff's mental impairment was not severe.[153]  Nevertheless, she assessed whether Plaintiff's psychiatric disposition met or equaled any of the disorders described in the listings of the regulations[154] (the "Listings"), specifically considering Listing 12.02 (Organic Mental Disorders), Listing 12.04 (Affective Disorders), and Listing 12.06 (Anxiety-Related Disorders) and found that her symptoms met the criteria of none and noting that the first mention of psychiatric problems was in September 2011 when Plaintiff reported that she independently performed ADLs and that no referral for psychiatric treatment was sought or made.[155]

On November 17, 2011, Frederick Cremona, M.D., ("Dr. Cremona") reviewed Plaintiff's medical record and completed a Physical

---

[150]    See Tr. 153.

[151]    Id.

[152]    See Tr. 219-32.

[153]    See Tr. 219.

[154]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[155]    See Tr. 219-31.

Residual Functional Capacity ("RFC") Assessment.[156]  Dr. Cremona found that Plaintiff was capable of occasionally lifting or carrying up to twenty pounds, frequently lifting or carrying ten pounds, standing and/or walking for a total of about six hours in an eight-hour workday, sitting for a total of about six hours in an eight-hour workday, and was not limited in her ability to push and/or pull.[157]  Additionally, Dr. Cremona found Plaintiff limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling.[158]  According to Dr. Cremona, the record did not establish any manipulative, visual, communicative, or environmental limitations.[159]  Dr. Cremona indicated that the record did not include a medical source statement regarding Plaintiff's physical capacity.[160]

A disability report completed on appeal of the initial decision stated that, since her surgery in October 2011, Plaintiff experienced sharp pains in the back of her neck and difficulty gripping items.[161]  In a function report completed in February 2012, Plaintiff stated that her condition limited her ability to work in the following ways:

---

[156]   See Tr. 233-40.

[157]   See Tr. 234.

[158]   See Tr. 235.

[159]   See Tr. 236-37.

[160]   See Tr. 239.

[161]   See Tr. 160.

I have headaches 5 out 7 days a week that last[] most of
the day.  Poor [c]on[c]entration, [p]oor balance loss of
control in left hand, medications have me dizzy, [p]oor
vision, can't hold a conversation because of [d]epression
[and] [h]eadaches, can't stand, walk or sit longer than
30 minutes because of pain in left leg, arm [and] hand,
poor coordination, memory loss[.][162]

With regard to ADLs, Plaintiff repeated many of the same
limitations identified in her initial function report except that
she reported no problems with eating or hearing, the ability to
shop for personal items once a month for ten minutes, the ability
to walk for thirty minutes before needing to stop and wait for the
pain to subside, the ability to pay attention for ten to fifteen
minutes.[163]  She stated that she went outside twice a month for
doctor appointments.[164]  In contrast to her first report, Plaintiff
stated that she had been "fired or laid off from a job because of
problems getting along with other people" when she had "a[n]
argument with a coworker and walked off the job."[165]

On April 3, 2012, Mark Lehman, Ph.D., ("Dr. Lehman"), at the
behest of the Commissioner, evaluated Plaintiff by performing a
clinical interview, a mental status examination, a full battery of
psychological tests and a review of Plaintiff's records.[166]

---

[162]   Tr. 166.

[163]   Compare Tr. 147-53 with Tr. 167-

[164]   See Tr. 169, 170.

[165]   Tr. 172.

[166]   See Tr. 284-89.

Plaintiff told Dr. Lehman that she did not complete her prescribed term of outpatient physical therapy because "it was very painful."[167]  The use of her left hand also caused Plaintiff pain, she said.[168]   She reported that the Chiari malformation decompression surgery helped alleviate her headaches but her memory and concentration had worsened as had her feelings of depression.[169]  Plaintiff said that her grandparents performed most routine ADLs and supervised her daughter.[170]  Plaintiff explained that she felt guilty about being unable to care for her daughter and that she recently had attempted suicide via medication overdose.[171]

Dr. Lehman assessed Plaintiff's full scale intelligence quotient ("IQ") to be 51.[172]  Plaintiff scored at the grade level of 5.5 in word reading, 3.5 in sentence comprehension, 4.7 in spelling, and 1.7 in math computation.[173]  Dr. Lehman diagnosed Plaintiff with dementia, not otherwise specified, with severely depressed mood and assessed Plaintiff's GAF at forty, a score at the high end of the category for "Some impairment in reality testing or communication . . . OR major impairment in several

---

[167]   Tr. 285.

[168]   See Tr. 286.

[169]   See id.

[170]   See id.

[171]   See id.

[172]   See Tr. 287.

[173]   See Tr. 288.

areas, such as work or school, family relations, judgment, thinking, or mood.[174]   Dr. Lehman opined that, while Plaintiff understood the meaning of filing for benefits, she was not able to manage benefits payments on her own behalf.[175]

On April 13, 2012, Randal Reid, M.D., affirmed Dr. Cremona's RFC assessment.[176]  On that same day, James B. Murphy, Ph.D., ("Dr. Murphy") reviewed Plaintiff's medical record and completed a Psychiatric Review Technique and a Mental RFC Assessment.[177]  Dr. Murphy assessed whether Plaintiff's psychiatric disposition met or equaled any Listing, specifically considering Listing 12.02 (Organic Mental Disorders) and found that dementia with severely depressed mood was a medically determinable impairment that did not precisely satisfy the criteria of Listing 12.02.[178]  He found that her symptoms did not equal the Listing's criteria.[179]

Dr. Murphy pointed out inconsistencies in the record, particularly between the reports of her treating physicians, Drs. Carruthers and Duckworth, and the psychological evaluation of consultative examiner, Dr. Lehman.[180]  Dr. Murphy observed that the

---

[174]    See Tr. 289.

[175]    See Tr. 283, 289.

[176]    See Tr. 290.

[177]    See Tr. 292-309.

[178]    See Tr. 292, 293

[179]    See Tr. 302-03.

[180]    See Tr. 304.

treating physicians did not note and Plaintiff did not allege the deficits that she reported and exhibited at the consultative psychological evaluation.[181]   Other inconsistencies with Dr. Lehman's conclusions as noted by Dr. Murphy included Plaintiff's reports to Dr. Duckworth and Sebastian that her headaches, fatigue, and tiredness improved after surgery, the treating physicians' notes that Plaintiff's neurological and memory examinations were intact, and the absence of any mention of memory or cognitive problems in the notes of her treating physicians.[182]   Dr. Murphy stated that, although Plaintiff reported five days a week of poor concentration and memory loss and a daily routine in which she lay in bed most of the time, she never sought additional treatment from her treating physicians.[183]   He also discounted the consulting examiner's opinions that Plaintiff suffered "severe memory problems" and dementia on the basis that the preponderance of record evidence did not support those conclusions.[184]

On the Mental RFC Assessment, Dr. Murphy evaluated Plaintiff as markedly limited in "[t]he ability to understand and remember detailed instructions" and "[t]he  ability to carry out detailed

---

[181]   See id.

[182]   See id.

[183]   See id.

[184]   See id.

instructions."[185]  He found her moderately limited in the following categories: (1) "[t]he ability to maintain attention and concentration for extended periods;" (2) "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" (3) "[t]he ability to accept instructions and respond appropriately to criticism from supervisors;" (4) "[t]he ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" and (5) "[t]he ability to respond appropriately to changes in the work setting."[186]  Regarding all of the other thirteen abilities considered under the broad categories of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, Dr. Murphy rated Plaintiff as not significantly limited.[187]

He concluded that Plaintiff could "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work settings."[188]

---

[185]   Tr. 306.

[186]   Tr. 306-07.

[187]   See id.

[188]   Tr. 308.

Defendant denied Plaintiff's applications at the initial and reconsideration levels.[189]  Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[190]  The ALJ granted Plaintiff's request and conducted a hearing on December 5, 2012.[191]

## C.  **Hearing**

At the hearing, Plaintiff and a vocational expert, Norman Hooge, Ph.D., ("Hooge"), testified.[192]  Plaintiff was represented by an attorney.[193]

The ALJ began the questioning, and, in response, Plaintiff stated that she experienced no improvement after the surgery.[194] She described the pain as aching in the left arm, leg, and neck and stabbing in the left hip.[195]  Plaintiff confirmed that her neurologist said that the condition could be permanent.[196] Plaintiff carried a cane prescribed by Dr. Duckworth that she said she took everywhere, including the bathroom at her home, because

---

[189]    See Tr. 35-42.

[190]    See Tr. 59.

[191]    See Tr. 68, 95, 733-81.

[192]    See Tr. 21, 733-81.

[193]    See Tr. 89, 92, 733.

[194]    See Tr. 738.

[195]    See Tr. 739.

[196]    See id.

she lacked balance and tended to fall.[197]  Plaintiff also reported experiencing headaches, blurry vision in her left eye, uncontrollable rotational movement of her eyes, and numbness on her left side.[198]  Plaintiff said that she tended to burn or cut herself without noticing because of the loss of feeling.[199]  Plaintiff said that she had been referred for physical therapy three times, but she "pretty much wasn't going" the third time because it was painful and she had not perceived any progress.[200]  She admitted that her failure to attend physical therapy was against Dr. Carruthers' medical advice.[201]

Plaintiff said that the problems she described affected her ability to work because she could sit for no more than twenty or thirty minutes and could stand only for fifteen minutes or walk only thirty feet with the assistance of her cane.[202]  She said she was incapable of lifting a gallon of milk with her left hand because of weakness or with her right hand because of pain in her neck.[203]  She also said that she was unable to grip anything with

---

[197]   See Tr. 740.

[198]   See Tr. 743, 745.

[199]   See Tr. 746.

[200]   See Tr. 759, 760.

[201]   See Tr. 760.

[202]   See Tr. 748, 749.

[203]   See id.

her left hand.[204]

Plaintiff claimed that she stayed in her room all day and slept most of the time and that her grandmother took care of her daughter.[205]   Plaintiff said she did not drive and that her grandmother drove Plaintiff to appointments.[206]   Plaintiff said that, in the last two years, she had not read any books, written any letters, traveled out of town, eaten at restaurants, or gone to the theater.[207]   She also reported a decrease in her hygiene maintenance, a lack of interest in activities, and an increase in feelings of guilt and worthlessness.[208]

The ALJ reviewed Plaintiff's education and past relevant work.[209]  The jobs discussed were security guard, medical assistant, telemarketer, customer service representative, and airport truck driver.[210]   The ALJ inquired about medications, and Plaintiff reported that the pain medication assuaged the pain for only ten or fifteen minutes.[211]  Upon questioning by her attorney, Plaintiff stated that the psychotropic medication affected her mental

---

[204]    See Tr. 770-71.

[205]    See Tr. 749-50, 767.

[206]    See Tr. 768.

[207]    See Tr. 769-70.

[208]    See Tr. 770.

[209]    See Tr. 750-58.

[210]    See id.

[211]    See Tr. 761.

sharpness.[212]

The ALJ turned to Plaintiff's psychological condition.[213]  They discussed a suicide attempt that occurred about a year earlier when Plaintiff overdosed on Tylenol.[214]  She reported that she had not gone to the hospital because her grandmother had given her "something" to make her vomit and had kept her awake.[215]  Even before the onset of psychological symptoms, Plaintiff reported experiencing difficulty in getting along with her coworkers.[216]

At the conclusion of Plaintiff's testimony, Hooge took the stand to discuss Plaintiff's past work history and the capability of an individual with Plaintiff's RFC to perform those or other jobs.[217]  Hooge considered Plaintiff's security guard job to be at a light exertional level and semi-skilled, her telemarketing job to be at a sedentary exertional level and semi-skilled, and her medical assistant job to be at a light exertional level and skilled.[218]  The ALJ presented the following hypothetical individual:

[A]ssume the individual is limited to sedentary work with

---

[212]    See Tr. 766-67.

[213]    See Tr. 762.

[214]    See id.

[215]    See Tr. 762-63.

[216]    See Tr. 755, 763.

[217]    See Tr. 772-79.

[218]    See Tr. 773-74.

the following additional limitations. No climbing
ladders, ropes, or scaffolding; work is limited to
simple, routine, repetitive tasks, performed in a work
environment free of fast[-]paced production requirements,
involving simple work[-]related decisions, with few if
any workplace changes; limited to jobs which can be
performed using a handheld assistive device, cane, only
for uneven terrain or prolonged ambulation.[219]

Hooge stated that such an individual could not perform any of
Plaintiff's prior relevant work but would be able to perform work
as a cubicle cashier, an office helper, and a ticket seller, all of
which were categorized as light but adjusted by Hooge to the number
actually performed at the sedentary level.[220] The ALJ adjusted the
hypothetical person's limitations by adding only occasional
reaching with the left arm, and Hooge said that such a person could
perform the three identified jobs.[221] If the person was "unable to
engage in sustained work activity for a full eight[-]hour workday
on a regular and consistent basis," due to psychological
impairments, that individual would not be able perform any job.[222]
When Plaintiff's attorney asked whether the hypothetical individual
could sustain work if she was unable to concentrate thirty percent
of the work time or would miss three workdays a month, Hooge said
that the individual would not be employable.[223]

---

[219]    Tr. 775.

[220]    See Tr. 776.

[221]    See Tr. 777.

[222]    See id.

[223]    See Tr. 778-79.

35

After the hearing, in a letter dated January 24, 2013, Plaintiff's attorney notified the ALJ that Plaintiff was hospitalized on January 14, 2013.[224]  In a letter dated February 13, 2013,[225] Plaintiff's attorney reported the second hospitalization on February 17, 2013.[226]  Plaintiff's file also contained records of the hospital admission on March 11, 2013.[227]

**D.   Commissioner's Decision**

On March 19, 2013, the ALJ issued an unfavorable decision.[228] The ALJ found that Plaintiff met the requirements of insured status through December 31, 2015, and that Plaintiff had not engaged in substantial gainful activity from September 20, 2010, the alleged onset date, through the date of the ALJ decision.[229]

The ALJ recognized the following impairments as severe: Chiari malformation, syringomyelia, and depression.[230]  The ALJ discussed Plaintiff's medical treatment for these diagnoses from September 13, 2010, through October 23, 2012, specifically detailing her care

---

[224]     See Tr. 202.

[225]     The date of the letter appears to be incorrect as it is prior to the hospitalization.  See Tr. 631.

[226]     See id.

[227]     See Tr. 641-43.

[228]     See Tr. 18-34.

[229]     See Tr. 21, 23.  The ALJ noted that Plaintiff worked after the alleged onset date, but the work "did not rise to the level of substantial gainful activity."  Tr. 23.

[230]     Tr. 23.

by Dr. Carruthers and at MHMRA.[231]  The ALJ also discussed the tests administered and conclusions drawn by Dr. Lehman during the consultative psychological examination.[232]  The ALJ did not mention Plaintiff's hospitalizations in January, February, and March 2013.[233]

The identified severe impairments, individually or collectively, did not meet or medically equal any Listing, according to the ALJ.[234]  In particular, the ALJ considered Listing 12.02 (Organic Mental Disorders) and Listing 12.04 (Affective Disorders) in connection with depression.[235]  The ALJ concluded that Plaintiff experienced mild restrictions in the performance of ADLs, mild difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation of extended duration and, therefore, did not meet the criteria of paragraph B of either Listing considered.[236]  The ALJ also found that paragraph C of either Listing was not met.[237]

In addressing Plaintiff's RFC to perform work-related activities, the ALJ discussed Plaintiff's alleged symptoms in

---

[231]    See Tr. 24-28.

[232]    See Tr. 26.

[233]    See id.

[234]    See Tr. 28.

[235]    See Tr. 28-29.

[236]    See id.

[237]    See Tr. 29.

detail, as well as mentioning Plaintiff's treatment for depression under the care of Dr. Carruthers.[238]   The ALJ considered Dr. Carruthers' Medical Release/Physician's Statement and accorded "some weight" to the extent that it was consistent with the ALJ's RFC assessment.[239]  He also accorded "some weight" to Dr. Murphy's opinions expressed in the April 2012 Psychiatric Review Technique and Mental RFC Assessment.[240]   The ALJ found Plaintiff to be more mentally and physically limited than did Drs. Phelan and Cremona at the initial level of review.[241]

Although he found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ did not find Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of the[] symptoms [to be] entirely credible."[242]

The ALJ concluded that Plaintiff was capable of performing sedentary work, more specifically, that she could lift and/or carry ten pounds occasionally and less than ten pounds frequently, could stand and/or walk for two hours in an eight-hour workday, and could sit for six hours in an eight-hour workday.[243]   As other

---

[238]   See Tr. 30-32.

[239]   Tr. 32.

[240]   Id.

[241]   See id.

[242]   Tr. 32.

[243]   Tr. 29.

limitations, the ALJ found that Plaintiff should not climb ropes, ladders, or scaffolding, could only occasionally reach with her left arm and handle items with her left hand, could perform only simple, routine, and repetitive tasks involving simple decisions with few workplace changes, could not perform work at a fast pace, and could not traverse uneven terrain or ambulate for prolonged periods without the assistance of a handheld device.[244]  The ALJ found "no objective medical evidence to show that the severity [of her symptoms] would prevent her from doing a job" consistent with her RFC.[245]

The ALJ found Plaintiff unable to perform her past relevant work of security officer, telemarketer, and medical assistant.[246] The ALJ noted that, as a younger individual with a high school education and the ability to communicate in English, transferability of job skills was not an issue under the Medical-Vocational Guidelines[247] ("the Grid"), and, if Plaintiff had been able to perform a full range of sedentary work, the Grid directed a finding of "not disabled."[248]  However, the ALJ's RFC assessment found that Plaintiff's ability to perform a full range of sedentary

---

[244]    Tr. 29–30.

[245]    Tr. 32.

[246]    See id.

[247]    20 C.F.R. Pt. 404, Subpt. P, App. 2.

[248]    See Tr. 33.

work was impeded by additional limitations; thus, the ALJ explained, he relied on the testimony of Hooge to determine whether Plaintiff could perform other work.[249]

Based on Hooge's response to the ALJ's hypothetical question asking whether a person with Plaintiff's age, education, work experience, and RFC could perform jobs available in the state and national economy, the ALJ stated that he found Plaintiff capable of performing the requirements of the unskilled occupations of a cubicle cashier, an office helper, and a ticket seller performed at the sedentary level.[250]   The ALJ found that Plaintiff had not been under a disability from September 20, 2010, through March 19, 2013, the date of the ALJ's decision.[251]

Plaintiff appealed the ALJ's decision, and, on March 21, 2014, the Appeals Council denied Plaintiff's request for review.[252]   The Appeals Council acknowledged the medical records of Plaintiff's hospitalizations in January, February, and March 2013 as additional evidence made part of the record.[253]   The Appeals Council's decision transformed the ALJ's decision into the final decision of the

---

[249]     See id.

[250]     See id.  The ALJ noted that the vocational expert acknowledged that all of these positions were listed as light but that most or all were performed at the sedentary level.  See id.  The vocational expert adjusted the availability of the positions accordingly.  See id.

[251]     See Tr. 34.

[252]     See Tr. 9–13, 17.

[253]     See Tr. 13.

Commissioner.    After receiving the Appeals Council's denial, Plaintiff sought judicial review of the decision by this court.[254]

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.   Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.   Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.   Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).   The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings.

---

[254]     See Tr. 9-13; Doc. 1, Pl.'s Orig. Compl.   Plaintiff requested and received additional time beyond the sixty days allowed to file a lawsuit following receipt of the Appeals Council's decision.   See Tr. 7-8.   Plaintiff filed an application to proceed in forma pauperis on May 23, 2014.   See Whitaker v. Colvin, 4:14-mc-1251, Doc. 1, Appl. to Proceed In Forma Pauperis.   The court granted the application on July 10, 2015.   See Whitaker v. Colvin, 4:14-mc-1251, Doc. 2, Ord. Dated July 10, 2015.

42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520, 416.920.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  Greenspan, 38 F.3d at 236.

## B.  Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence.

Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains the following errors: (1) failure to consider and properly address all of the evidence, specifically Dr. Lehman's findings and the 2013 hospitalizations; and (2) failure to afford proper weight to Plaintiff's treating physicians' opinions, specifically those of Drs. Carruthers and Flores.  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

**A.**   **Failure to Consider and Properly Address all of the Evidence**

Pursuant to the Act, an ALJ is given the tasks of making factual findings and disability determinations.  See 42 U.S.C. § 405(b)(1).  When the decision is unfavorable, in whole or in part, it must "contain a statement of the case, in understandable language, setting forth a discussion of the evidence[] and stating the Commissioner's determination and the reason or reasons upon which it is based."  Id.  The ALJ is not "required to address every piece of evidence" in the process.  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000); see also Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007)(stating that "the ALJ is not always required to do an exhaustive point-by-point discussion" but must offer support for his conclusions so that a reviewing court can determine whether the decision is based on substantial evidence)(quoting Cook v. Heckler, 738 F.2d 1168, 1172 (4th Cir. 1986)).

**1.  Dr. Lehman's Findings**

Plaintiff asserts that the ALJ's decision is "nonsensical and is not supported by substantial evidence" because he "failed to address the significance of [Dr. Lehman's] findings."[255]  In particular, Plaintiff asserts that the diagnosis of dementia, the IQ assessment of fifty-one, and the GAF assessment of forty are findings that were not given sufficient attention by the ALJ.

The ALJ devoted approximately three-fourths of a page to Dr.

---

[255]    Doc. 19, Pl.'s Mot. for Summ. J. p. 12.

Lehman's findings.[256]   The ALJ clearly took the test results and opinions of Dr. Lehman into consideration.   However, Dr. Lehman's opinion is an outlier on all three of the points raised by Plaintiff and is inconsistent with the medical record as a whole.

Dementia is the result of damage or disease to the "parts of the brain used for learning, memory, decision making, and language."[257]   Drs. Carruthers and Duckworth made no mention of memory difficulties that rose to the level of dementia, much less identified any damage or disease that would give rise to dementia. In fact, they found her memory to be intact.   These two physicians treated Plaintiff for extended periods and subjected Plaintiff to various medical tests but never suggested that Chiari malformation or any other diagnosed condition could cause dementia or diagnosed Plaintiff with any mental condition that approached the severity of dementia.   The same is true of Dr. Flores's treatment of Plaintiff. He never acknowledged severe memory problems in his appointment notes.   None of her treatment providers expressed concern with Plaintiff's thinking or reasoning.

Dr. Lehman's tests indicated that Plaintiff, a younger individual who graduated high school and earned a certificate in medical assisting, had an IQ of fifty-one and performed academically at the elementary level in word reading, sentence

---

[256]   See Tr. 26.

[257]   What is Dementia?, WebMD (Dec. 22, 2015), www.webmd.com/brain/types-dementia#1.

comprehension, spelling, and math computation.   Nothing in the remainder of the record suggests that low level of intellectual performance.   In fact, the reasons given for her inability to perform tasks at home, for example reading and cooking, were related to headaches or physical limitations, not intellectual impairments.   Neither Dr. Carruthers nor Dr. Duckworth ever indicated that she was unable to comprehend their instructions. Neither Dr. Flores nor Plaintiff's counselor ever indicated a concern that she was functioning well under her educational level. Her physical therapy notes indicate that pain and weakness were the only obstacles to her ability to perform the exercises taught to her.

The GAF score assessed by Dr. Lehman was five points lower than that assessed by Dr. Flores a month earlier, dropping Plaintiff from the middle of the range for serious symptoms or serious impairment in social, occupational, or school functioning to the high end of the range for some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

The Commissioner has determined that GAF scores warrant little or no weight in disability determinations because they do not "have a direct correlation to the severity requirements in our mental disorders listings." Revised Med. Criteria for Evaluating Mental Disorders & Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65

(Aug. 21, 2000).  Moreover, a GAF score provides a snapshot of functioning on the day assessed and provides little guidance for determining what limitations may burden an individual in the performance of work-related activities.

Finally, Dr. Murphy reviewed Dr. Lehman's evaluation and found dementia with severely depressed mood to be a medically determinable impairment.  However, when he compared the evaluation with the record as a whole, Dr. Murphy found inconsistencies between it and the reports of her treating physicians.  Dr. Murphy specifically noted that the deficits Plaintiff reported and exhibited to Dr. Lehman greatly exceeded those noted by Drs. Carruthers and Duckworth.  He also pointed out that Plaintiff's treating physicians, upon examination, found her neurological functions and memory to be intact and that they did not note any memory or cognitive problems.  The ALJ's inclusion of limitations of simple, routine, and repetitive tasks involving simple decisions, few workplace changes, and no fast-paced work is consistent with Dr. Murphy's findings that Plaintiff was markedly limited in her ability to understand and remember detailed instructions and in her ability to carry out detailed instructions.

In light of the inconsistencies between Dr. Lehman's evaluation and the other record evidence, the ALJ accorded Dr. Lehman's findings the appropriate amount of significance.  The ALJ was under no obligation to discuss it in any more detail than he

did.

**2. 2013 Hospitalizations**

Plaintiff argues that the ALJ failed to address the records of three hospitalizations that occurred in early 2013 after the hearing, despite her submission of those records before the ALJ issued his opinion. She also complains that the Appeals Council issued a form denial without providing a discussion of those records. Plaintiff contends that the medical findings in the hospital records dilute the ALJ's rationale, rendering his opinion not supported by substantial evidence.

Although the ALJ was not required to discuss every piece of evidence, his failure to even mention the hospital records is unfortunate. Even so, the court finds the failure to be harmless. See Audler, 501 F.3d at 448 (recognizing that, even if an error occurred, it is harmless "as long as 'the substantial rights of a party have not been affected'")(quoting Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)). Harmless error exists when there is no possibility that the ALJ would have reached a different conclusion absent the error. Bornette v. Barnhart, 466 F. Supp.2d 811, 816 (E.D. Tex. 2006)(citing Frank v. Barnhart, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, consideration of the three hospitalizations would not have changed the ALJ's disability determination. At first blush, the frequency and duration of the hospitalizations during that time appear significant to Plaintiff's disability status. However, the

48

records indicate that Plaintiff suffered from three separate acute conditions.   During the first hospitalization, Plaintiff was diagnosed and treated for acute internal jugular vein thrombosis and cellulitis.   She was instructed to follow up only for biopsy results, which proved negative.   During the second, Plaintiff underwent examinations by various specialists that ultimately resulted in no new diagnoses.   She was instructed to return only for a retest of blood-clotting time.   During the third, Plaintiff was treated for pain resulting from a psoas hematoma.

Although Plaintiff was in acute conditions serious enough to be hospitalized three times, she was examined, treated, and discharged without ongoing treatment (other than medication) and without any indication that the conditions would persist for an extended period.   None of the hospitalizations was overtly related to her claimed impairments; none suggested any effect on her ability to perform work-related activities.

Unlike the ALJ, the Appeals Council stated, in its denial of Plaintiff's request for review, that it considered the records of Plaintiff's 2013 hospitalizations.[258]   The Appeals Council denied review because it "found no reason under [its] rules to review" the ALJ's decision.[259]   The Appeals Council listed the reasons upon

---

[258]   See Tr. 10.

[259]   See Tr. 9.

which review may be granted.[260]  Among those reasons was the receipt
of new and material evidence that resulted in a finding that the
ALJ's decision was "contrary to the weight of all the evidence now
in the record."[261]

Although the Appeals Council is required to consider new and
material evidence, the requirement of a detailed discussion of
additional evidence by the Appeals Council, however, was suspended
by a memorandum from the Executive Director of Appellate Operations
on July 20, 1995.  See Higginbotham v. Barnhart, 405 F.3d 332, 335
n.1 (5th Cir. 2005); Hearings, Appeals, & Litigation Law Manual, §
I-3-5-90, 2001 WL 34096367, Memo. Dated July 20, 1995.

The court finds that Plaintiff's substantive rights were not
affected by the ALJ's failure to address the hospital records.  The
court also finds no error in the Appeals Council's denial.

**B.   Failure to Afford Proper Weight to Plaintiff's Treating
Physicians' Opinions**

The ALJ must evaluate every medical opinion in the record and
decide what weight to give each.  See 20 C.F.R. §§ 404.1527(c),
416.927(c).  The ALJ is required to give good reasons for the
weight given a treating source's opinion.  20 C.F.R.  §§
404.1527(c)(2), 416.927(c)(2);  SSR 96-2p, 1996 WL 374188, at *5
(July 2, 1996).

When the determination or decision . . . is a denial[,]

---

[260]    See id.

[261]    Id.

> . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5.

The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000); SSR 96-2p, 1996 WL 374188, at *1.

When the ALJ does not give a treating physician's opinion controlling weight, he must apply the following nonexclusive factors to determine the weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; and (5) the treating physician's area of specialization.    20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Newton, 209 F.3d at 456.   However, the ALJ is only required to consider these factors in deciding what weight to give a medical

source opinion; he is not required to record in writing every step of the process.  20 C.F.R. §§ 404.1527(c), 416.927(c) ("Unless we give a treating source's opinion controlling weight . . . we *consider* all of the following factors in deciding the weight we give to any medical opinion.")(emphasis added).

Even though the medical opinion and diagnosis of a treating physician should be afforded considerable weight, "the ALJ has sole responsibility for determining a claimant's disability status." Martinez v. Chater, 64 F.3d 172, 176 (5th Cir. 1995)(quoting Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)).  A medical source's statement that the claimant is "disabled" or "unable to work" does not mean the Commissioner will determine the claimant is, in fact, disabled.  Spellman v. Shalala, 1 F.3d 357, 364 (5th Cir. 1993)(citing 20 C.F.R. § 404.1527(e)(1)[262]; see also 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).  The determination of disability is not a medical opinion entitled to deference, but a legal conclusion within the Commissioner's scope of authority.  Frank, 326 F.3d at 620.

### 1. Dr. Carruthers

Plaintiff argues that, "rather than discussing Dr. Carruthers' findings during [Plaintiff's] seven examinations," the ALJ "simply elected to give Dr. Carruthers' disability opinions 'some

---

[262]    This provision has been moved to 20 C.F.R. §§ 404.1527(d)(1).

weight.'"[263]

Plaintiff is clearly mistaken in her assertion that the ALJ failed to discuss Dr. Carruthers' findings.  The ALJ discussed in detail Dr. Carruthers' chart notes from Plaintiff's initial appointment on July 11, 2011, through the last recorded appointment on October 9, 2012.[264]  In total, the ALJ devoted the equivalent of at least one page of his fourteen-page decision to Dr. Carruthers' appointment notes.

The ALJ also devoted an additional third of a page to Dr. Carruthers' Medical Release/Physician's Statement of October 9, 2012, and gave it "some weight."[265]  In comparing the ALJ's RFC with Dr. Carruthers' statement, the court notes that Dr. Carruthers assessed Plaintiff as capable of longer periods of sitting, standing or walking, and claiming stairs/ladders than did the ALJ.[266]  The ALJ did not include limitations on kneel/squatting, bending/stooping, or pushing/pulling, as did Dr. Carruthers, but the ALJ did limit reaching with the left hand to only occasionally and walking for prolonged periods only with the assistance of a

---

[263]    Doc. 19, Pl.'s Mot. for Summ. J. p. 21.

[264]    See Tr. 24-27.  Only one appointment, on February 1, 2012, is missing from the ALJ's discussion of Plaintiff's treatment under Dr. Carruthers.  See Tr. 25.  That record indicates that the purpose of the visit was to collect paperwork for disability.  See Tr. 281.

[265]    Tr. 32.

[266]    Compare Tr. 32 with Tr. 460.

cane, which were not in Dr. Carruthers' assessment.[267]

On one point, Dr. Carruthers' assessment was internally inconsistent in that she indicated that Plaintiff could not lift/carry anything for more than an hour in one section and, in another, answered that Plaintiff was limited to lifting/carrying objects weighing more than five pounds to two hours per day.[268] The ALJ determined that Plaintiff could lift/carry ten pounds occasionally and less than ten pounds frequently.[269] Dr. Carruthers also opined that Plaintiff could "complete community work in an office environment with little physical strain or demand."[270] Overall, the two reports overlapped on several limitations, and, in certain respects, the ALJ's RFC was more limiting than that of Dr. Carruthers.

Based on the mistaken reading of the ALJ's decision, Plaintiff asserts that the ALJ should have articulated specific reasons for rejecting Dr. Carruthers' opinion. However, the ALJ stated that Dr. Carruthers' opinion on Plaintiff's work limitations were accorded "some weight," not completely rejected. The ALJ noted that he gave her opinion as much weight as was consistent with his assessment of Plaintiff's RFC, which, he said, was based upon the

---

[267]   Compare Tr. 32 with Tr. 460.

[268]   See id.

[269]   See Tr. 32.

[270]   Tr. 460.

objective medical evidence as a whole.  Thus, although not clearly articulated, the ALJ provided a good reason for the weight given Dr. Carruthers' opinion.

Dr. Carruthers' opined that Plaintiff was "unable to work" and that Plaintiff's "disability [was] not permanent and [was] expected to last more than 6 months."[271]  This opinion is not entitled to any deference as the disability determination is the ALJ's decision to make.  See Frank, 326 F.3d at 620.  The court also notes that an inability to work for more than six months does not necessarily mean that a severe impairment has lasted or could be expected to last for a continuous period of at least twelve months, as required by the Act.  See 42 U.S.C. § 423(d)(1)(a).

## 2. Dr. Flores

Plaintiff argues that the ALJ's decision ignored Dr. Flores' opinion that Plaintiff's GAF was forty-five, positing that Dr. Flores's GAF assessment "expressed his opinion that [Plaintiff] was unable to maintain a job."[272]

While it is accurate that the ALJ did not discuss Dr. Flores's GAF assessment, it is an exaggeration to say that a GAF score of forty-five necessarily reflects the provider's opinion that a patient cannot maintain a job.  A GAF score of forty-five falls within the category of serious symptoms or any serious impairment

---

[271]   Tr. 460.

[272]   Doc. 19, Pl.'s Mot. for Summ. J. p. 17.

in social, occupational, or school functioning, which lists as an example the inability to keep a job.[273]   It takes a leap of interpretation to assume that a score or forty-five is an opinion that Plaintiff is unable to work.  As discussed above, a GAF score provides a snapshot of functioning and provides limited insight into the factors underlying the assessment.  Nevertheless, to the extent that Dr. Flores's GAF assessment can be read as a statement that Plaintiff was unable to work, it is entitled to no deference. See Frank, 326 F.3d at 620.

The ALJ discussed Dr. Flores's treatment notes but did not err in the assessment of Plaintiff's ability to work by failing to give weight to Dr. Flores's GAF assessment or any assumptions about Plaintiff's ability to work that could be drawn from it.

## C.  Disposition

Finding no legal error in the ALJ's decision and finding that substantial record evidence supports his conclusion that Plaintiff is not disabled, the court must affirm the decision.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days

---

[273]   See Diagnostic & Statistical Manual of Mental Disorders 34 (Am. Psychiatric Ass'n 4th ed. 2000).

from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 15th day of February, 2017.

_____
U.S. MAGISTRATE JUDGE